John DOE, Plaintiff–Appellee, Cross–
Appellant (90–5288/5348),
Appellant (90–5346),

v.

SULLIVAN COUNTY, TENNESSEE,
Mike Gardner; Lynn Hawkins, Defen-
dants–Appellants, Cross–Appellees (90–
5288/5348),

Lon V. Boyd, Keith Westmoreland, Depu-
ty Sheriff Murph, Deputy Sheriff Con-
ner, Deputy Sheriff Lynch, Tyrone
Ross, Defendants.

Nos. 90–5288, 90–5346 and 90–5348.

United States Court of Appeals,
Sixth Circuit.

Argued March 25, 1991.

Decided Feb. 10, 1992.

Everett H. Mechem (argued and briefed), Frank A. Johnstone, Wilson, Worley, Gamble & Ward, Kingsport, Tenn., Penny J. White, Johnson City, Tenn., Charles Vance Ketron, Gray, Tenn., for John Doe.

John S. McLellan, III (briefed), Gene H. Tunnell (briefed), Charlton R. DeVault, Jr. (argued and briefed), Kingsport, Tenn., for Sullivan County, Tenn., Mike Gardner, Lynn Hawkins, Lon V. Boyd, Keith Westmoreland, Deputy Sheriff Murph, Deputy Sheriff Conner, Deputy Sheriff Lynch and Tyrone Ross.

Before JONES and SUHRHEINRICH, Circuit Judges, and JOINER, Senior District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Defendants Sullivan County, Mike Gardner, and Lynn Hawkins appeal a jury verdict in favor of plaintiff John Doe for injuries sustained while incarcerated. Plaintiff in turn appeals directed verdicts for the remaining defendants and pretrial orders limiting evidence and denying his motion to add new defendants. For the reasons that follow, we reverse and remand for further proceedings.

I

On September 6, 1986, plaintiff was arrested on third-degree burglary charges for the theft of comic books, pens, and a calculator. The next day plaintiff was placed in the Sullivan County Jail ("Jail"). On September 11, 1987, plaintiff pled guilty to a misdemeanor and was sentenced to a six-month term of imprisonment at the Jail. At the time of his incarceration, plaintiff was nineteen years old, weighed 125 pounds, and suffered from "an obvious mental disability." J.A. at 15.

Plaintiff was placed in a cell with nine or ten other inmates from September 6 to October 10, 1986. During this period, inmate Tyrone Ross reportedly began harassing plaintiff. On October 1, as prison employees were removing another inmate from the cell, the remaining inmates were "slammed" together to separate them from the inmate being removed. While so separated, Ross sexually assaulted plaintiff by inserting a toothbrush into his anus. Ross was subsequently charged with and convicted of the attack.

Plaintiff filed this suit under 42 U.S.C. § 1983 on September 22, 1987. Named as defendants were: (1) Sullivan County, Tennessee; (2) Tyrone Ross; (3) Sheriff Mike Gardner, Superintendent of the Jail; (4) Keith Westmoreland, Jail Administrator prior to August 1986 and County Executive thereafter; (5) Lon V. Boyd, County Executive from 1980–86; (6) Chief Jailer Lynn

* The Honorable Charles W. Joiner, Senior Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

Hawkins; (7) Deputy Sheriff Murph; (8) Deputy Sheriff Conner; and (9) Deputy Sheriff Lynch. The complaint alleged that the defendants were aware that the Jail's overcrowding created an unreasonable risk of inmate assaults, that the inmate classification system failed to separate inmates who had violent tendencies, and that the guards failed to adhere to a system of periodic security checks in violation of state law.

Shortly before trial, Sullivan County moved to disqualify plaintiff's counsel Everett Mechem because it wished to call him as a witness. The district court granted the motion on October 3, 1988, and this court subsequently denied plaintiff's motion for a writ of mandamus ordering the district court to vacate its order. *In re Mechem*, 880 F.2d 872, 875 (6th Cir.1989). Mechem reentered the case after Sullivan County revealed Mechem would not be called as a witness. On May 19, 1989, the district court denied plaintiff's motion to add jailers Baker and Peters as defendants.

A jury trial began on September 20, 1989. At trial, prison expert Gordon Kamka testified that plaintiff should have been placed in protective custody while at the Jail due to his slight build and mental disability. Kamka conducted a risk assessment of the Jail and concluded that "there was a risk of harm for every inmate in that facility." J.A. at 502. His analysis of jail records and inmate interviews revealed a pattern of violence among inmates and infrequent security checks by guards. During trial, the court granted plaintiff's motion to dismiss Deputy Sheriff Conner. At the close of plaintiff's proof, the court granted the directed verdict motions of Deputy Sheriffs Murph and Lynch because "no evidence was adduced showing that the deputies either knew or should have known that an assault on the plaintiff was highly foreseeable." *Id.* at 83. In granting directed verdict motions in favor of former County Executive Lon Boyd and current County Executive Keith Westmoreland, the district court found "that no proof was adduced showing that either Mr. Boyd or Mr. Westmoreland committed any act against plaintiff or created any policy prox-

imately causing harm to the plaintiff." *Id.* at 82–83. Finally, the court granted a directed verdict for all defendants on plaintiff's claim that inadequate lighting and overcrowding caused plaintiff's injuries.

At the close of evidence, the court instructed the jury to consider plaintiff's § 1983 claim under the Eighth and Fourteenth Amendments. On September 25, 1989, the jury returned a judgment against defendants Sullivan County, Gardner, and Hawkins and awarded plaintiff $100,000 in compensatory damages. The court awarded plaintiff an additional $40,000 on his state law claims against Sullivan County; however, this amount was subsumed within the amount awarded on the federal claim. Defendants' motion for judgment notwithstanding the verdict or, alternatively, for a new trial was denied on October 24, 1989. This timely appeal followed.

Plaintiff on appeal challenges the directed verdicts, various rulings at trial, and the calculation of damages. Sullivan County, Gardner, and Hawkins appeal the denial of their directed verdict motion, the jury instructions, and the exclusion of Deputy Murph's testimony, as well as the state law judgment.

## II

■ We first consider whether the court erred in directing a verdict against plaintiff on the claim that "systemic deficiencies" at the prison caused plaintiff's injuries in violation of the Eighth Amendment. In reviewing a district court's disposition of a motion for a directed verdict or for a judgment notwithstanding the verdict, we examine

> whether there was sufficient evidence to raise a material question of fact for the jury.... "[T]he trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made."

*Frost v. Hawkins County Bd. of Educ.,* 851 F.2d 822, 826 (6th Cir.) (quoting *More-*

*lock v. NCR Corp.*, 586 F.2d 1096, 1104–05 (6th Cir.1978)), *cert. denied,* 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988). The motion is properly granted where "there is 'either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable men could differ.'" *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1419 (6th Cir.1990) (quoting *Milstead v. International Bhd. of Teamsters*, 580 F.2d 232, 235 (6th Cir. 1978)), *cert. denied,* —— U.S. ——, 112 S.Ct. 51, 116 L.Ed.2d 29 *and cert. denied,* —— U.S. ——, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991).

> We have recently reaffirmed that
> the legal standard applicable to determining whether a violation of the eighth amendment occurred in the context of an assault upon an inmate is whether the defendants' conduct amounted to a 'deliberate indifference' to a risk of injury to the plaintiff. The Supreme Court in *Whitley* [*v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)] concluded that in order to support an action under section 1983, plaintiffs must establish something more than lack of ordinary due care, inadvertence or error. Instead, the conduct must be 'obdurate' or 'wanton' *i.e.,* a recklessness or callous neglect. This standard is designed to strike an appropriate balance between the deference that should be accorded to prison officials in their administration of the prison and the constitutional right of prisoners to be free from cruel and unusual punishment.

*Roland v. Johnson,* 856 F.2d 764, 769 (6th Cir.1988); *see also Wilson v. Seiter,* —— U.S. ——, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991).

Plaintiff's evidence at trial indicated that (1) overcrowding at the Jail necessitated more staff to decrease the risk of violence, (2) the cells were dark, (3) more jailers were needed, (4) fourteen-day mental and physical evaluations were not performed, and (5) security checks often were not performed every thirty minutes, as required by jail procedures. Plaintiff argues that, had these conditions not obtained, the assault would not have occurred.

Viewing this evidence, as we must, in a light most favorable to the plaintiff, we cannot conclude that these conditions caused the assault. As offensive as these conditions may have been, they do not support plaintiff's Eighth Amendment claim absent proof that they proximately caused his injury. While we recognize that proving causality in circumstances like these may prove difficult, we are nonetheless convinced that more is required than plaintiff's naked assertion that the assault would not have occurred but for the offensive conditions. To hold otherwise would effectively transform the causality requirement from a substantive element of proof into one of pleading. This we are unwilling to do. The district court found that plaintiff failed to produce any evidence showing a causal relationship between his injuries and the alleged overcrowding, insufficient lighting, or inadequate surveillance. After careful review of the record, we agree.

■ Plaintiff also argues that the district court erred in directing a verdict in favor of defendants Lynch and Murph on the claim that they were deliberately indifferent to his safety. The evidence against Lynch consisted exclusively of plaintiff's testimony that Lynch knew of the harassment:

Q: Do you recall Officer Lynch and another deputy ... asking you if, if anybody was bothering you or if you needed to be moved?

A: Yes, sir.

Q: And what did you tell them?

A: I told them, told them that, that I would be like to put [sic] in another cell if it's possible. They asked me why, and I said that I believed that Tyrone has been harassing me and I think he's sexually assaulted me.

. . . .

Q: Are you certain that you told Officer Lynch that Tyrone Ross was harassing you and you wanted to be moved?

A: Yes.

J.A. at 454–55. Although the parties dispute whether this exchange occurred before or after the assault, we believe that

the district court correctly ruled that it occurred after. Plaintiff repeatedly contradicted himself on when he notified Lynch of Ross's harassment. For example, plaintiff conceded that "[t]he only thing I blame myself for is not, not telling any of the guards the next day after it [the rape] had happened; that's the only thing I blame myself for." *Id.* at 442. Plaintiff's admissions on cross examination similarly called into question the veracity of his prior testimony:

Q: Now, on these visits to the nurse, you did not make any statements to the nurse to the effect that you were being harassed by Tyrone Ross or being bothered with any type of a sexual assault, did you?

A: No.

Q: And, in fact, the only time that you ever told anybody at the jail that you were having problems in cell block 3 was after Officer Murph overheard you talking to your mother about it, is that correct?

A: Yes, sir.

*Id.* at 450. In addition, Dr. Kutty, the prison psychiatrist who treated plaintiff following the rape, testified that plaintiff never told him that he informed the jailers of the harassment as it occurred. *Id.* at 462. We believe that the court correctly directed a verdict for Lynch. Other than plaintiff's self-contradictory testimony, no evidence suggested that Lynch acted with deliberate indifference to plaintiff's safety.

■ The evidence against Murph was equally deficient. Although plaintiff alleges that security checks were not performed every thirty minutes, as required by prison regulations, plaintiff rests this allegation on the fact that each security check was not logged. Murph, however, offered undisputed testimony that every security check was made but that each check may not have been logged. Because this testimony went unchallenged, we cannot but conclude that plaintiff offered insufficient evidence of Murph's deliberate indifference to withstand a directed verdict. Accordingly, we affirm the directed verdicts in favor of defendants Lynch and Murph.

### III

■ Plaintiff next claims that the district court improperly limited the introduction of evidence relating to defendant Gardner's earlier felony conviction. When plaintiff's counsel on cross-examination sought to elicit details of the conviction, the district court stopped the questioning on the ground that "the number of felonies doesn't have anything to do with his credibility. The fact that he has been convicted of a felony does affect his credibility; and other than that, it has no purpose at all...." J.A. at 667.

■ The Supreme Court has held that, in the civil context, Rule 609(a) requires that the trial court admit evidence of a witness's prior convictions regardless of the potential prejudice to either party. *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 525–26, 109 S.Ct. 1981, 1993–94, 104 L.Ed.2d 557 (1989). Thus, a court may not incorporate the general balancing test of Rule 403 into Rule 609(a) motions in the civil context. *Id.*[1]

Although *Green* clearly establishes that the court must admit evidence of a witness's prior convictions in civil trials, less clear is the scope of evidence of circumstances relating to and surrounding the conviction that must be admitted. We are inclined to believe that *Green* would require admission to the extent urged by the plaintiff in this case, namely, the nature of the crime, the number of counts, and the date of the disposition. Upon review of the record, however, we conclude that the court's refusal to admit details of Gardner's conviction did not affect a substantial right of plaintiff. *See* Fed.R.Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is

---

1. We note that the Supreme Court's holding effectively overrules Part II.B of our opinion in *Donald v. Wilson*, 847 F.2d 1191, 1194–98 (6th Cir.1988), where we held that evidence of prior convictions offered to attack the credibility of a witness in the civil context is subject to the balancing test of Rule 403.

affected...."). Despite the court's ruling, the jury returned a verdict against Gardner. Plaintiff's contention that the details of the conviction may have swayed the jury to award a greater amount in damages is simply too speculative to warrant reversal.

## IV

█ Plaintiff next urges that the denial of his motion to add jailers Waterson, Peters, and Baker as defendants constitutes reversible error. In denying plaintiff's motion, the district court relied principally upon *Schiavone v. Fortune*, 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986). The Supreme Court, interpreting Federal Rule of Civil Procedure 15(c) ("Relation Back of Amendments"), set forth four requirements for an amendment to "relate back" to the original complaint:

> (1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

*Schiavone*, 477 U.S. at 29, 106 S.Ct. at 2384. Following the Court's holding in *Schiavone*, we noted that

> where the complaint alleges in substance that the new defendants committed the illegal acts and are officials of the original defendant, that relationship may imply receipt of sufficient notice. All that we add concerning the inquiry of whether the new defendants knew or should have known that the suit should have been brought against them is that it is a patently factual inquiry and left to the district court.

*Berndt v. Tennessee*, 796 F.2d 879, 884 (6th Cir.1986) (citations omitted) (footnote omitted).

The sole issue before us is whether the three additional jailers "must or should have known that, but for a mistake concerning identity, the action would have been brought against [them] ... within the prescribed limitations period." *Schiavone*, 477 U.S. at 29, 106 S.Ct. at 2384. Tennessee law provides that actions brought under the federal civil rights statutes must be commenced within one year after the cause of action accrued. Tenn.Code Ann. § 28-3-104(a)(3) (Supp.1991). The district court found that the cause of action accrued on October 5, 1986 and concluded that plaintiff failed to show that the three additional defendants must have received notice of the action no later than October 5, 1987. Plaintiff counters that, because the original complaint listed "other Deputy Sheriffs to be named later," J.A. at 11, knowledge of the lawsuit should be imputed to the three guards.[2]

We believe that the court's finding was not clearly erroneous. Although as jailers the three defendants reasonably could be expected to have known of the instant suit, this alone is insufficient to impute to them knowledge of their future status as defendants. Many jailers and employees who were not named as defendants were aware of and even deposed in this case. It cannot seriously be maintained, however, that knowledge of their interest in the matter should be imputed to all of them. Plaintiff offers no grounds for why jailers Waterson, Peters, and Baker should have been uniquely aware that they were parties in interest. We therefore affirm the district court's denial of plaintiff's motion to add the three additional defendants.

## V

█ As a final matter, plaintiff challenges the district court's limitation of de-

---

**2.** Plaintiff also contends that the filing of the in forma pauperis petition on September 22, 1987 "tolled" the statute of limitations. Even assuming this is true, the statute of limitations would only be tolled with respect to the date within which to file the original complaint, not with respect to the relation back of the additional defendants. Neither party disputes that the original complaint was timely filed.

fendants' liability under state law to $40,-000. The court so ruled pursuant to Act of May 25, 1982, ch. 950, 1985 Tenn.Pub.Acts 842, *amended by* Tenn.Code Ann. § 29–20–403 (Supp.1990), which provides that "[e]very policy or contract of insurance purchased by a governmental entity ... shall provide ... limits of not less than forty thousand dollars ($40,000) for bodily injury or death."

Plaintiff relies on Tenn.Code Ann. § 29–20–310(b) (1980), which stated at the time plaintiff's cause of action accrued that no judgment may be entered against an employee for damages when the governmental unit is also liable, "unless the amount of damages sought or judgment entered exceeds the minimum limits set out in § 29–20–404." [3] Plaintiff submits that, under section 29–20–310(b), Gardner and Hawkins would be liable under state law for any amount exceeding the $40,000 limit of Sullivan County's liability. This interpretation finds strong support in *Jenkins v. Loudon County*, 736 S.W.2d 603, 606 n. 5 (Tenn. 1987) which held that, under section 29–20–310(b), "[t]he general rule of personal liability of governmental employees continues for all liability exceeding any limited statutory exposure."

While we agree that defendants Gardner and Hawkins could be liable for any state law award in excess of the $40,000 cap, plaintiff has conceded throughout these proceedings that any award based on state law would be subsumed within the § 1983 award because both claims stem from the same injury. Because we agree that plaintiff has stated a valid claim under § 1983 and is therefore entitled to damages on his federal claim, we believe the district court's mistake had no bearing on the amount of damages awarded below. We simply clarify this issue to assist the parties in any further proceedings.

## VI

■ Defendants Sullivan County, Gardner, and Hawkins ask us to reverse the denial of their motion for a directed verdict, arguing that because the court dismissed the counts against jailers Lynch and Murph, it was obliged to direct a verdict for them as well on the basis of *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam). In *Heller*, the plaintiff brought suit under § 1983 alleging that he had been arrested without probable cause and had been the victim of excessive force. *Id.* at 797, 106 S.Ct. at 1572. In a bifurcated trial, the claims against the police officer went to the jury without a qualified immunity instruction. When the jury returned a verdict in favor of the officer, the court dismissed the claims against the City. *Id.* at 798, 106 S.Ct. at 1572–73. On appeal, the Supreme Court affirmed, reasoning that, because the jury was not charged on any affirmative defenses, the verdict conclusively established that the plaintiff had not suffered a constitutional injury at the hands of the officer. Absent a constitutional injury, there were no grounds upon which to impose liability upon the municipality. *Id.* at 799, 106 S.Ct. at 1573. The Court concluded that

> neither *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611] (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

*Heller*, 475 U.S. at 799, 106 S.Ct. at 1573. Defendants argue that because the claims were dismissed against Murph and Lynch, *Heller* precludes liability against them as well. We believe defendants misunderstand the logic of *Heller*.

---

**3.** As explained in *Johnson v. Smith*, 621 S.W.2d 570, 572 n. 3 (Tenn.Ct.App.1981), the reference to section 29–20–404 is clearly a typographical error; the reference should be to section 29–20–403, as this section sets out the limits of liability.

A § 1983 claim against police officers who assert qualified immunity must be dismissed even if the officers violated the plaintiff's rights, so "long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated" in light of clearly established law. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *accord Yates v. City of Cleveland,* 941 F.2d 444, 447 (6th Cir.1991); *Hall v. Shipley,* 932 F.2d 1147, 1150 (6th Cir. 1991). Conversely, to survive a qualified immunity claim, a plaintiff must show not only that the officer's conduct deprived him of a constitutional right, but also that the officer reasonably should have known that the conduct violated clearly established law. *See Dominque v. Telb,* 831 F.2d 673, 677 (6th Cir.1987). Thus, the dismissal of a claim against an officer asserting qualified immunity in no way logically entails that the plaintiff suffered no constitutional deprivation, nor, correspondingly, that a municipality (which, of course, is not entitled to qualified immunity) may not be liable for that deprivation. At most it means that an officer in the defendant's position could reasonably have believed that the conduct in question did not violate law that was clearly established at the time.

The Court in *Heller* was careful to point out that the officer in that case had not claimed qualified immunity and, thus, that the jury's verdict established with legal certainty that Heller had not suffered a constitutional deprivation. *Heller,* 475 U.S. at 799, 106 S.Ct. at 1573; *see also Frost v. Hawkins County Bd. of Educ.,* 851 F.2d 822, 827 (6th Cir.) (interpreting *Heller* as holding that municipality cannot be liable where jury finds that plaintiff suffered no constitutional deprivation), *cert. denied,* 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988). Thus, *Heller* simply reaffirmed that a determinative issue in § 1983 claims against municipalities is whether the plaintiff has suffered a deprivation of his constitutional rights. To read *Heller* as implying that a municipality is immune from liability regardless of whether the plaintiff suffered a constitutional deprivation simply because an officer was entitled to qualified immunity would, we are convinced, represent a misconstruction of its holding and rationale. *See Newcomb v. City of Troy,* 719 F.Supp. 1408, 1417 (E.D.Mich.1989) (holding that municipality may be liable even where claim is dismissed against officer asserting qualified immunity).

In the instant case, the district court dismissed the claims against Murph and Lynch after they asserted qualified immunity, yet accepted the jury's determination that plaintiff suffered a deprivation of his constitutional rights while incarcerated and that Sullivan County, Gardner, and Hawkins were liable for this deprivation. That defendants Lynch and Murph were immune from suit in no way casts doubt on the reasonableness of the court's or the jury's findings. We therefore affirm that the district court did not commit error in denying the motion to dismiss defendants Gardner, Hawkins, and Sullivan County.

Defendants also maintain that a directed verdict in their favor was required given the insufficiency of the evidence supporting plaintiff's Eighth Amendment claim. Defendants point out that only one homosexual assault was reported in the ten years preceding the incident at issue here and that the prior assault was properly investigated. While conceding that altercations among prisoners frequently occurred, jailers testified at trial that these incidents received prompt and effective attention.

Plaintiff's evidence, of course, presented a much different picture of conditions at the Jail. Norman Cox, who testified as defendants' prison expert, stated on cross-examination that the level of violent incidents in August and September of 1986 reached approximately four incidents per month for every 100 inmates. One jailer testified that inmates told him every day that they were in danger and wanted to be moved. Viewing this evidence in the light most favorable to plaintiff, *Frost,* 851 F.2d at 826, we believe the district court ruled correctly in denying the directed verdict motions of Sullivan County, Gardner, and Hawkins on plaintiff's Eighth Amendment claims.

## VII

Sullivan County, Gardner, and Hawkins next argue that the jury instructions incorrectly set forth the standards under which they could be found liable under the Eighth and Fourteenth Amendments. In reviewing the adequacy of jury instructions, we "affirm the jury's verdict unless the instructions, viewed as a whole, were confusing, misleading, and prejudicial. Only if the charge insufficiently or misleadingly instructs the jury on an issue crucial to the jury's determination of the dispute, should we set aside a jury verdict." *Chonich v. Wayne County Community College*, 874 F.2d 359, 366 (6th Cir.1989) (citation omitted). We review the jury instructions seriatim.

### A. *Eighth Amendment Instructions*

■ The district court instructed the jury with respect to plaintiff's Eighth Amendment claim as follows:

Now, plaintiff's Eighth Amendment claim is brought against two policymakers for the Sullivan County Jail and against Sullivan County. In order to prove this claim, the burden is on the plaintiff to establish the following by a preponderance of the evidence:

One, a pervasive risk of harm existed at the jail prior to the time that the plaintiff was incarcerated there in September 1986.

Now, this element requires the plaintiff to show that his being assaulted was not an isolated incident. A pervasive risk of harm can be established on evidence showing that inmates at the jail felt unsafe; that jail operations invited a risk of harm; or that a high incident [sic] of violence occurred at the jail.

Now, the second element of the offense charged which must be proven is that the plaintiff belonged to a class of individuals likely to be attacked.

. . . .

Now, third, the policies controlling at the jail, the plaintiff must prove that the policies controlling at the jail exhibited a deliberate indifference to the threat to the plaintiff's physical safety.

Now, under this third element, deliberate indifference can be established on evidence showing that despite an unreasonable risk of harm, the defendants failed to guard against this risk; or that customs, practices or policies at the jail facilitated the risk of harm.

And then the fourth element the plaintiff must prove is that the policies at issue was [sic] the proximate cause of injury and consequential damages to the plaintiff.

Now, deliberate indifference is more than mere "recklessness" on the part of any county official. "Recklessness" requires only proof that a reasonable man would have appreciated the great degree of risk of physical harm to the plaintiff. In order for an act to be "deliberate," the particular official must have been shown to have been aware that adverse consequences from his action were certain or substantially certain to cause the injury.

Now, before you can find that any defendant was deliberately indifferent, the plaintiff must prove that the individual defendant was aware that a particular act or inaction was certain or substantially—substantially certain to deprive the plaintiff of his constitutional rights and that the defendants decided to act or not to act in spite of that knowledge.

J.A. at 722–24.

Although these instructions are essentially the same as those proposed to the court by the defendants, they now object that (1) the district court stated that the jury must find a "pervasive risk of harm" where defendants preferred "pervasive risk of homosexual attack," (2) the court allowed the jury to consider the inmate's appearance and intelligence level in determining whether he was likely to be attacked, and (3) the jury was not instructed that a constitutional violation does not occur each time an inmate is attacked. After careful consideration, we do not believe that these objections warrant reversal. The instructions accurately stated each element that plaintiff was required to establish under the Eighth Amendment, including the requirement that the evidence sup-

port a finding of "deliberate indifference." *See Roland v. Johnson*, 856 F.2d 764, 769 (6th Cir.1988). We therefore hold that the Eighth Amendment jury instructions were sufficient.

## B. *Fourteenth Amendment Instructions*

 The court's instructions with respect to plaintiff's Fourteenth Amendment claim were as follows:

[U]nder the fourteenth amendment, an individual cannot be deprived by the government of life, liberty or property without due process of law. Now, due process is that which protects the individual from arbitrarily losing his protected interest, requiring that the individual be notified of the deprivation and given an opportunity to dispute it. A protected liberty interest may be created through statutes, rules, regulations or policy statements. In this case, plaintiff had a liberty interest protected by the Fourteenth Amendment to be classified according to his physical and mental attributes and the nature of the crime for which he was convicted. Pursuant to this liberty interest, plaintiff can recover if you find the following by a preponderance of the evidence.

One, that the plaintiff was deprived of his liberty interest without due process of law;

and, second, that the deprivation proximately caused the plaintiff to be injured.

Now, since the injuries cannot be presumed to flow from every violation of constitutional or state law rights, plaintiff must also prove by a preponderance of the evidence that the defendants' acts or omissions proximately caused his injuries. Now, a proximate cause of an injury is a cause which in natural and continuous sequence produces the injury and without which the injury would not have occurred. A defendant's act in order to be a proximate or legal cause of a plaintiff's injuries need not have been the whole cause or the only factor in bringing them about. It is enough if the act

was a substantial factor in causing the plaintiff's injuries.

J.A. at 724–25.

 Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause and the laws and regulations of the States. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). As an initial matter, defendants direct our attention to *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) and *Walker v. Norris*, 917 F.2d 1449 (6th Cir.1990), to support their claim that the instructions should have informed the jury that plaintiff could only recover if defendants' actions were obdurate or wanton. In *Whitley*, the Supreme Court indicated that the Fourteenth Amendment affords no greater protection than the Eighth Amendment for inmate claims alleging unlawful infliction of pain or punishment and, thus, that such claims fall solely under the Eighth Amendment. *Whitley*, 475 U.S. at 327, 106 S.Ct. at 1088. The Court reasoned as follows:

We think the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified.... Because this case involves prison inmates rather than pretrial detainees or persons enjoying unrestricted liberty we imply nothing as to the proper answer to that question outside the prison security context by holding, as we do, that in these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishment Clause.

*Id.* at 327, 106 S.Ct. at 1088; *accord Walker*, at 1455 (requiring that prisoner's claim predicated on stabbing incident in prison be brought under the Eighth Amendment rather than as a substantive due process claim under the Fourteenth Amendment).

While we agree that a showing of wantonness is required to establish a violation

of an inmate's *substantive* due process rights, we find that issue irrelevant to the case at bar for the simple reason that the Fourteenth Amendment instructions here quite clearly addressed only the *procedural* component of the Due Process Clause, that is, whether the deprivation, without a hearing, of liberty interests established under state law, violated plaintiff's Fourteenth Amendment rights. The court instructed the jury that "due process is that which protects the individual from *arbitrarily* losing his protected interest, requiring that the individual be *notified* of the deprivation and *given an opportunity to dispute it. A protected liberty interest may be created through statutes, rules, regulations, or policy statements.*" J.A. at 724 (emphasis added). Thus, the jury instructions simply did not speak to liberty interests emanating from the *substantive* component of the Due Process Clause.

Similarly, *Whitley* and *Walker* address the overlap only between inmate claims arising under both the Eighth Amendment and the substantive branch of the Due Process Clause. This is because both clauses address the substantive protections enjoyed by incarcerated individuals against the "wanton infliction of pain in penal institutions." *Whitley*, 475 U.S. at 327, 106 S.Ct. at 1088. The procedural component of the Due Process Clause, by contrast, addresses the quite distinct right of individuals to a hearing regarding the deprivation by the state of a liberty interest established elsewhere, as, for instance, in state law. Because the Fourteenth Amendment instructions in the case at bar clearly addressed only the procedural and not the substantive component of the Due Process Clause, we find the concerns expressed in *Whitley* and *Walker* inapposite to our analysis.

▮▮▮ Plaintiff clearly rested his underlying liberty interest on state law. Whether state law establishes a protected liberty interest requires a close examination of the language of the relevant statutes and regulations. *Thompson*, 490 U.S. at 461, 109 S.Ct. at 1909. For instance, the use of "explicitly mandatory language" in connection with "specified substantive predicates" that limit the decisionmaker's discretion will support the conclusion that the State has created a liberty interest. *Id.* at 463, 109 S.Ct. at 1910. "If this liberty interest exists as a function of state law, then the prisoner or inmate is entitled 'to those minimum procedures appropriate under the circumstances and required by the Due Process clause to insure that the state-created right is not arbitrarily abrogated.' " *Martucci v. Johnson*, 944 F.2d 291, 294 (6th Cir.1991) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974)).

▮▮▮ This court has stated that "where substantive limitations have in fact been placed on the discretion of prison officials in classifying inmate's [sic] security status, a protectible liberty interest has been created." *Beard v. Livesay*, 798 F.2d 874, 879 (6th Cir.1986). In the instant case, entry classification procedures were governed by the Sullivan County Jail Manual of Policy and Procedures ("Manual"). The Manual contains explicit mandatory language regarding classification. The section entitled *"Policy*:—Classification of Inmates," states that

> [f]or the preservation of the security and order of the detention facility, its staff and inmates, every inmate *will* be classified upon admission [to] the facility, and *will* be assigned housing according to the classification.

J.A. at 208 (emphasis added).[4] The following subsection entitled "Procedure" con-

**4.** The full text of this section reads as follows:
POLICY:—CLASSIFICATION OF INMATES
There is a written plan for prisoner classification specifying criteria and procedures for classifying prisoners in terms of level of custody required, housing assignment and participation in correctional programs.
NOTE: Some of the factors to consider might be: history of violence or nonviolence; male

v. female; protective custody; security risks; and age.
*There will be separation among:*
a. Males and females
b. Adults and juveniles
For the preservation of the security and order of the detention facility, its staff and inmates, every inmate will be classified upon admission the the [sic] facility, and will be assigned

tains equally explicit mandatory language ensuring that "[t]he Jail Administrator, Chief Jailer, or Booking Officer, *will* review the admissions records and any existing facility records concerning the inmate," and that "[t]he Booking Officer *will* then assign a classification code." *Id.* at 209 (emphasis added). Moreover, the Manual sets forth specific substantive predicates that limit prison officials' discretion in classifying inmates. Of particular relevance to the instant case, the procedures require prison officials to consider an inmate's "History of Violent or Disruptive Behavior," "Evidence of Homosexuality or Vulnerability to attack," and "Evidence of Mental or Physical Handicap." *Id.* The regulations thus established a protectible liberty interest in classifying plaintiff with regard to his safety and mental disabilities.

■ The Supreme Court has recently reiterated that, under the rubric of procedural due process, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct.

975, 983, 108 L.Ed.2d 100 (1990). Thus, where procedural due process is alleged, "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Id.* at 126, 110 S.Ct. at 983.

■ To determine what procedural protections are constitutionally required in the given case, several factors come into play:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Whether the postdeprivation remedies provide constitutionally adequate recourse will turn on "whether predeprivation procedural safeguards could address the risk of deprivations of the kind ... allege[d]," *Zinermon,* 494 U.S. at 132, 110 S.Ct. at 987, or

housing according to the classification. There will be no discrimination by race, creed, religion, or national origin.
*Physical Separation of Classes of Inmates—* The facility will make every reasonable effort to provide separate housing for each of the following categories of inmates:
—Usentenced [sic] Females
—Sentenced Females
—Unsentenced Males
—Sentenced Males
—Other Classes of Detainees, e.g., Witnesses, Civil Prisoners
—Community Custody Inmates, e.g., Work Releases, Weekenders, Trusties
—Inmates with special problems, e.g., Alcoholics, Narcotic addits [sic], Mentally Disturbed Persons, Physically Handicapped Persons, Persons with Communicable Diseases
—Inmates Requiring Disciplinary Detention
—Inmates Requiring Administrative Segregation
—Juveniles
*PROCEDURE*
1. *Review of records:* The Jail Administrator, Chief Jailer, or Booking Officer, will review the admissions records and any existing facili-

ty records concerning the inmate for the following information:
a. Sex
b. Age (Juvenile or Adult)
c. Offense
d. Legal status
 1. sentenced
 2. unsentenced
 3. state witness
 4. work release
e. History of Violent or Disruptive Behavior
f. Evidence of Homosexuality or Vulnerability to attack
g. Evidence of Mental or Physical Handicap
h. Evidence of Suicidal Tendency
2. *Classification:* The Booking Officer will then assign a classification code, in the order listed below:
a. Sex—"M" (male) or "F" (female)
b. Age—"A" (adult) or "J" (juvenile)
c. Violence—"V" (potentially violent) or "N" (non-violent)
d. Legal Status—"P" (pre-trial) or "S" (sentenced)
e. Special Problem—"SP" (special problem) or "WR" (work release—trustee)
J.A. at 208–09.

"whether predeprivation safeguards would have any value in guarding against the kind of deprivation ... allegedly suffered." *Id.* at 135, 110 S.Ct. at 988. The above determination, in turn, will rest on such issues as whether the deprivation was predictable, whether a predeprivation process is possible, and whether the defendants' conduct was "authorized" in the sense that "[t]he State delegated to [state employees] the power and the authority to effect the very deprivation complained of ... and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law." *Id.* at 138, 110 S.Ct. at 990.

As this synopsis illustrates, whether state officials deprived a complainant of procedural due process is an extremely intricate and complex inquiry requiring the balancing of many competing concerns. The instructions in the case at bar, we believe, fail to reflect this complexity. On the instructions given, the jury could have returned a verdict for plaintiff on the legally uninformed determination that defendants deprived plaintiff's liberty interests "arbitrarily" and "without due process of law." In making this determination, the jury was not asked to consider whether plaintiff's constitutional interest in adequate procedure was satisfied by postdeprivation state law remedies, or even whether a predeprivation hearing was a meaningful possibility under the circumstances. Given the extreme brevity of the charge, we believe it quite possible that the jury was confused or misled as to the basis for which it properly could have found defendants liable under the Fourteenth Amendment. We therefore conclude that the jury instructions given by the district court constitute reversible error.

## VIII

Defendants next insist that the district court committed reversible error in preventing the testimony of Murph, who was present at the time of the rape. Federal Rule of Evidence 403 permits the exclusion of evidence where its probative value is substantially outweighed by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. On review, we uphold trial court decisions on admissibility under Rule 403 unless there is a clear abuse of discretion and the court's decision is inconsistent with substantial justice. *See Zamlen v. City of Cleveland,* 906 F.2d 209, 215 (6th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1388, 113 L.Ed.2d 444 (1991). Defendants submit that Murph was prepared to testify that plaintiff was "slammed" in with Ross for no more than two to three minutes and that plaintiff's account of the incident was greatly exaggerated. Defendants contend this testimony would have impacted the amount of compensatory damages.

The court had already granted Murph's motion for a directed verdict when defense counsel sought to admit Murph's testimony. After excusing the jury, the court stated that it would reconsider its directed verdict for Murph if his testimony cast doubt on that ruling. Murph chose not to testify. At the close of trial, defendants again sought to offer Murph's testimony into evidence. At this point, the district court disallowed the testimony on the ground that, given the evidence already proffered by both parties, Murph's testimony would be repetitive. Our review of the record compels us to conclude that these rulings by the court did not amount to an abuse of discretion.

## IX

As a final matter, Sullivan County argues that plaintiff is not entitled to a state law judgment based on negligence because the state has not waived its sovereign immunity from suit for alleged civil rights violations. Sullivan County rests its contention on the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn.Code Ann. §§ 29–20–101 to 407 (1980 & Supp. 1990). In particular, section 29–20–205 of the GTLA provides in relevant part that "[i]mmunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury: ... (2) Arises out of ... invasion of right of priva-

cy, or civil rights." Tenn.Code Ann. § 29–20–205 (1990). Plaintiff's state law claim relies on section 8–8–302 of the Tennessee Code, which provides that

[a]nyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of, or under color of his office.

Tenn.Code Ann. § 8–8–302 (1988).

In *Jenkins v. Loudon County*, 736 S.W.2d 603 (Tenn.1987), the Supreme Court of Tennessee held that section 29–20–205 did not preclude an award for damages flowing from a deputy sheriff's violation of plaintiff's civil rights sought pursuant to the provisions of sections 8–8–301 through 8–8–303. *Id.* at 609. In concluding that sovereign immunity was not preserved by section 29–20–205, the Court reasoned that "[a]ctions for the *non-negligent* misconduct of deputies do not 'aris[e] pursuant to' the GTLA ... and may therefore be covered by T[enn.] C[ode] A[nn.] § 8–8–301, *et seq.*, in the appropriate cases." *Id.* (emphasis added). The Court cautioned, however, that its holding did not extend to actions for negligence. *Id.*

The district court justified its award of $40,000 under state law on the grounds that the violation of plaintiff's civil rights also constituted negligence. We instruct the district court on remand to consider whether plaintiff is entitled to an award under state law in light of the jury's verdict under the Eighth Amendment that defendants were deliberately indifferent to plaintiff's constitutional rights.

## X

For the reasons stated above, we find that the error in the district court's instructions is such that there is no way of determining if the jury's verdict was predicated on the Eighth Amendment claim or the erroneous instruction regarding the Fourteenth Amendment claim. We therefore REVERSE and REMAND for proceedings consistent with this opinion, including a reconsideration of the state law award. All other aspects of the disposition of the district court are AFFIRMED.